# DECLARATION

I, Phillip W. Lowdermilk, a Special Agent with the Drug Enforcement Administration, hereby state, pursuant to Title 28 of the United States Code, Section 1746, under penalty of perjury and pursuant to the laws of the United States, that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) assigned to the Greensboro Resident Office since February 2012. I have been employed by the DEA for approximately sixteen years. Prior to that, I was a Deputy Sheriff with the Guilford Country Sheriff's Department for approximately five years. As a result of my training and experience obtained through my investigative efforts, I have gained considerable knowledge in the field of drug law enforcement, and the techniques and methodology utilized by drug traffickers in negotiating, financing, procuring, packaging, and distributing illegal controlled substances, as well as the methods used in "laundering" and concealment of proceeds from the sale of illegal controlled substances.

2. This declaration is submitted in support of a Verified Complaint of Forfeiture for $921,770.00 in U.S. Currency seized on November 6, 2014, in Greensboro, North Carolina.

3. The facts and circumstances set forth in this Declaration are based upon the Declarant's personal knowledge and information provided by other law enforcement officers.

4. On November 6, 2014, Trooper S.P. Fortner of the North Carolina State Highway Patrol (NCSHP) was conducting preventive patrol in Guilford County, North


GOVERNMENT EXHIBIT a

Carolina in a marked, black and silver patrol vehicle. The conditions were very windy and cold outside. Trooper Fortner was traveling eastbound on Interstate 40 (I-40) near mile marker 210 when he observed a white Volvo tractor trailer in the far right lane travel outside of its lane to the right. The tractor trailer continued to weave in its lane of travel and it was clear that the driver was having difficulty controlling the vehicle inside his lane. According to Trooper Fortner, traffic was light to medium on the interstate at this time. At approximately 8:53 pm, Trooper Fortner activated his blue lights in an attempt to stop the tractor trailer for failing to maintain lane control. The vehicle then pulled off the road on the right shoulder of I-40 at the 212A exit off ramp as Trooper Fortner positioned his patrol vehicle behind the tractor trailer.

5. Trooper Fortner then exited his patrol car and made a passenger side approach on the tractor trailer where he observed a Hispanic male in the passenger seat, as well as a Hispanic male in the driver's seat. Trooper Fortner greeted the driver and requested that the driver step outside with his driver's license, registration, and insurance information. As Trooper Fortner was waiting for the driver to exit the vehicle with his paperwork, he noticed that the passenger appeared very nervous. Trooper Fortner could physically see the passenger's heart beating through movement of his chest and stomach and noticed that he would not make eye contact. The driver stepped outside the truck and provided the appropriate paperwork. Trooper Fortner invited the driver to have a seat in his patrol car so he could stay warm as his paperwork was verified. Before sitting in the patrol car, the driver was checked for weapons and found to not have any. Upon checking the driver's

information, Trooper Fortner discovered that the he had a valid Texas driver's license and was identified as Jesus DURAN of Mission, Texas. Trooper Fortner explained to Mr. DURAN that the reason he was stopped was because he had traveled outside of his lane of travel and he wanted to make sure that he wasn't sleepy and confirm that it was safe for him to be driving. Mr. DURAN agreed and stated that he knew he had traveled outside of his lane of travel and explained that his trailer was empty and the strong gusts of wind made it more difficult to control. Trooper Fortner advised Mr. DURAN that he understood how the strong winds could make the tractor trailer more difficult to control and was only going to issue him a written warning for the lane violation.

6. While completing the written warning, Trooper Fortner and Mr. DURAN engaged in casual conversation. Mr. DURAN advised that he had unloaded earlier in the day in Currie, North Carolina, which he explained was located near Wilmington, North Carolina. Upon hearing this, Trooper Fortner became puzzled as to why Mr. DURAN was traveling east through Greensboro at approximately 9:00 p.m. if he had unloaded in eastern North Carolina earlier in the day. Trooper Fortner wanted to clarify Mr. DURAN's statement in the case that he was confused and meant to say that he was instead driving to Currie, North Carolina, which would make sense for the direction of travel, but Mr. DURAN stated "no," he unloaded in Currie earlier that day and was traveling to Effingham, South Carolina to pick up another load. Trooper Fortner then advised Mr. DURAN that he was traveling east, to which Mr. DURAN responded, "I don't know where Effingham is, I just put it in the GPS."

7. Trooper Fortner continued to check the registration of the tractor trailer and asked Mr. DURAN who the owner of the truck was. Mr. DURAN stated that he does not know the owner personally but his name is Juan Antonio TIJERINA. According to Mr. DURAN, he has never met Mr. TIJERINA but this was his second trip utilizing his tractor trailer. While speaking with Mr. DURAN, Trooper Fortner noticed that Mr. DURAN was receiving numerous text messages to his cell phone and was attempting to reply to his messages. Mr. DURAN was then asked to put his cell phone away and he complied, placing the cell phone in his pocket.

8. Trooper Fortner listened as Mr. DURAN continued to explain that he had brought a load of ice cream from Houston, Texas and delivered it to Currie, North Carolina on November 6. When asked when he departed Texas for his trip, Mr. DURAN advised that he left the "day before yesterday" which would have been Tuesday, November 4th. Mr. DURAN seemed unsure about when he departed Texas and was apparently becoming uncomfortable answering questions from Trooper Fortner. Mr. DURAN was taking deep breaths and appeared frustrated when he was asked to produce his driver's log book. Mr. DURAN provided his log book and Trooper Fortner was able to see that the actual departure date had been on Monday, November 3. When asked when he had to be in Effingham, South Carolina, Mr. DURAN stated by 9:00 a.m. on Friday morning.

9. As Trooper Fortner was writing the warning ticket and speaking with Mr. DURAN in casual conversation, he asked who the passenger in the truck was. Mr. DURAN responded and stated that the passenger was a neighbor of his from Texas.

4

When asked his name, Mr. DURAN responded "Rusvel," but could not provide the last name. Mr. DURAN explained that the passenger got in the truck with him in McAllen, Texas, however he was not a co-driver due to the fact that he did not possess a Commercial Driver's License (CDL). When asked by Trooper Fortner what the purpose of having "Rusvel" accompany him on the trip was, Mr. DURAN advised that "Rusvel" wanted to come to North Carolina and look at some trucks or trailers he had identified on "Craigslist" that were for sale. It seemed very unusual to Trooper Fortner that Mr. DURAN would allow a person that he barely knew to accompany him in the truck from Texas to North Carolina in order to look at items found on "Craigslist." According to Mr. DURAN, "Rusvel" had been calling the people listed on "Craigslist" but could get no one to answer and eventually gave up. Mr. DURAN advised that trailers were much cheaper here than they were in Texas. A trailer bought for five or six thousand dollars here could then be taken to Texas and sold for eight or nine thousand dollars.

10. While waiting for the warning ticket to print from his in-car terminal, Trooper Fortner asked to take another look at Mr. DURAN's log books which clearly made him nervous and he began taking deep breaths. Trooper Fortner noticed in the log books that Mr. DURAN had departed Currie, North Carolina at 3:30 p.m. on Thursday, November 6 and then taken a break at the Quality Mart in Kernersville, North Carolina at approximately 6:30 p.m. It was suspicious to Trooper Fortner that Mr. DURAN traveled west for more than three hours to Kernersville, North Carolina where he then took a break and was traveling back eastbound through Greensboro, North Carolina when the traffic stop

5

occurred at approximately 8:53 p.m. Trooper Fortner questioned Mr. DURAN reference these movements since he supposedly was scheduled to arrive in Effingham, South Carolina by 9:00 a.m. the next morning. Mr. DURAN stated the reason for traveling this far west was because "Rusvel" had been attempting to contact several different people that had trailers for sale but was unable to speak with anyone.

11. Once the warning ticket had printed, Trooper Fortner provided Mr. DURAN with his copy and explained that he was only receiving a warning ticket for the lane violation. Mr. DURAN was advised that he did not have a court date for the violation, did not owe any fines, and that the warning ticket would not affect his driving record. Mr. DURAN was provided with all of his paperwork and personal belongings and asked if he had any questions of Trooper Fortner. As Mr. DURAN began to exit the patrol vehicle, Trooper Fortner asked if he could speak with the passenger. Mr. DURAN stated "yes" and at this time Trooper Fortner approached the truck in order to make contact and speak with the passenger while Mr. DURAN waited in his patrol vehicle.

12. Trooper Fortner approached the right side of the tractor trailer in order to speak with the passenger and attempt to corroborate the story of Mr. DURAN. When asked to provide his license, the passenger did so which confirmed that he did not have a CDL as Mr. DURAN had advised. The full name of the passenger was Rusvel RIOS-MOLINA. According to Trooper Fortner, the passenger continued to be noticeably nervous while speaking, his face was red and flushed and he was breathing rapidly because his chest and stomach were rising and falling quickly. The passenger did advise that "Jesus" (Mr.

DURAN) was his friend and that he had traveled to North Carolina with him to look at trailers. Trooper Fortner attempted to question the passenger more but was unable to do so because he stated that he did not speak English. Due to the language barrier, Trooper Fortner was unable to obtain additional information from the passenger.

13. Trooper Fortner then returned to his patrol vehicle in order to clarify a few things that seemed suspicious about Mr. DURAN's and Mr. RIOS-MOLINA's story. It was explained to Mr. DURAN by Trooper Fortner that it did not make any sense as to why, if he had departed Currie, North Carolina earlier in the day and was supposedly now traveling to Effingham, South Carolina, why would he be driving eastbound in Greensboro, North Carolina at this time. Mr. DURAN was also advised that it seemed very unusual to have a "friend" ride from South Texas all the way to North Carolina, only to see some trucks and trailers that were on Craigslist. At this time Mr. DURAN stated, "Well, he's not my friend, he's a friend of my cousin and I've only seen him twice and he gave me $200.00 United States Currency (USC) to ride up." This seemed very suspicious to Trooper Fortner and led him to believe that both the driver and passenger were involved in some type of criminal activity. Trooper Fortner then asked Mr. DURAN if he had anything illegal in his truck or trailer, to which he responded "no." Trooper Fortner then asked separate questions to Mr. DURAN as to if he had any marijuana, cocaine, guns, or illegal cargo in his truck or trailer, and he responded "no" to each question. Finally, Trooper Fortner asked Mr. DURAN if he had a large amount of money in the truck or trailer, to which he responded, "not that I know of."

14. At approximately 9:20 p.m., Trooper Fortner requested and received written and verbal consent from Mr. DURAN to search the truck and trailer in its entirety. Upon receiving consent to search, Trooper Fortner contacted Trooper B.A. Jones and requested his assistance reference a canine sniff of the vehicle. Trooper Jones arrived on scene at approximately 9:25 p.m. and was advised that consent had been granted to search the truck and trailer. With both Mr. DURAN (driver) and Mr. RIOS-MOLINA (passenger) secured and away from the truck and trailer, Trooper Jones deployed his state issued canine "Wyatt" to conduct a narcotics sniff of the vehicle's exterior and interior. Shortly after being deployed, Trooper Jones advised that "Wyatt" had alerted in a positive manner for the presence of the odor of narcotics inside the vehicle. Trooper Jones has been a NCSHP certified canine handler since December of 2013. Both Trooper Jones and canine "Wyatt" received their most recent recertification as a canine team on May 5-6, 2014 at the Virginia State Police Training Academy. During this recertification, the canine team was certified in the detection of marijuana, hashish, heroin, ecstasy, methamphetamine, and cocaine.

15. Once it was learned that there had been a positive canine alert for the presence of narcotics inside the vehicle, NCSHP Sgt. J.S. Wooten, Trooper S.L. Williamson and Trooper M.J. Ward arrived on scene in order to assist with the physical inspection of the truck and trailer. Trooper Jones and Trooper B.P. Daniels provided scene security during the inspection. During the physical search, Trooper Williamson found a hidden compartment behind the passenger's seat and inside some after market shelves that had

been installed in the cab of the truck. Looking down inside this hidden compartment, Trooper Williamson advised that he could see multiple packages of what appeared to be bundled United States Currency (USC).

16. Once the packages of USC had been located inside the truck, both Mr. DURAN and Mr. RIOS-MOLINA were secured in handcuffs and placed in the back of Trooper Fortner's patrol vehicle. Both subjects were advised that they were not under arrest at this time but were being detained while members of the NCSHP took photos of the scene. It was then decided by Sgt. Wooten that both suspects, as well as the tractor trailer, would be transported to the NCSHP office in Greensboro for further investigation. Trooper Fortner transported Mr. RIOS-MOLINA in his patrol vehicle while Sgt. Wooten advised that Mr. DURAN would need to drive the tractor trailer to the office, with Trooper Ward as the passenger, due to the fact that no one else possessed a Commercial Driver's License. It was also during this time that Sgt. Wooten contacted NCSHP Task Force Officer (TFO) to the DEA, Dave Peterson, who agreed to adopt the currency for federal forfeiture and meet at the office for further investigation.

17. Upon arrival to the NCSHP office, both suspects were placed in separate rooms for interviews as troopers continued to inspect the tractor trailer for contraband. The search resulted in a total of twenty-nine (29) individually wrapped packages located in the hidden compartment. The packages all seemed to be vacuum sealed, however some were wrapped with black tape and some were wrapped in plastic wrap. While being interviewed, both Mr. DURAN and Mr. RIOS-MOLINA disclaimed ownership of the

9

USC and signed paperwork documenting that they knew nothing about the large sum of currency that had been discovered inside the vehicle. Once all paperwork had been completed regarding the investigation, Mr. DURAN and Mr. RIOS-MOLINA were provided a receipt stating an unknown amount of USC had been seized from them and they were released.

18. A check of Texas DMV records indicated that the tractor trailer in which the USC was discovered was owned by Juan Antonio TIJERINA-CANTU of McAllen, Texas. Both Mr. DURAN and Mr. RIOS-MOLINA stated that they did not know Mr. TIJERINA-CANTU personally.

19. Based on my training and experience, I know that illegal narcotics trafficking generates large amounts of cash and that it is common for those involved in such illegal activities and their associates to transport narcotics and cash proceeds by vehicle; that such vehicles sometimes use concealed compartments to hide narcotics and cash proceeds, or transport commercial freight in an effort to make the travel appear to have a legitimate purpose; that drug proceeds are often wrapped in plastic or otherwise packaged in ways designed to thwart detection by canines trained to detect the odor of narcotics; and that persons involved in such illegal activities often use multiple cell phones to conduct trafficking related communications.

20. Based on my training and experience I believe that the totality of the facts and circumstances, including without limitation the amount of currency found inside the tractor sleeper area, the manner in which it was packaged and concealed, the nervousness

of DURAN and RIOS-MOLINA, and denial of knowledge of the currency and the hidden compartment in which the USC was secreted, collectively support the conclusion that the currency constitutes proceeds of the unlawful sale and distribution of controlled substances.

21. The U.S. Currency was seized as drug proceeds and taken to the State Employees Credit Union where it was counted by bank personnel and converted into an official check for the amount of $921,015.00. It was later determined by members of the State Employees Credit Union that an error had been made while conducting the initial count of the currency. Therefore a second official check was prepared in the amount of $755.00 bringing the total of USC seized to $921,770.00. Both checks were issued in the respected amounts and addressed for deposit to the United States Marshal Service Seized Asset Deposit Fund.

22. DEA seized the $921,770.00 in U.S. currency on November 6, 2014 and began an administrative forfeiture proceeding. Personal Notice of Seizure was made to Jesus DURAN, Rusvel RIOS-MOLINA, and Juan Antonio TIJERINA-CANTU on January 28, 2015. At the time of this Declaration, there have been no known claims to the seized property. On or about March 2, 2015, the seizure was referred to the United States Attorney's Office for the initiation of judicial forfeiture proceedings.

CONCLUSION

23. Based upon the foregoing, your Declarant is of the opinion that there is probable cause to believe that the $921,770.00 in U.S. currency was furnished or intended

11

Case 1:15-cv-00326-UA-JLW   Document 1-1   Filed 04/16/15   Page 11 of 12

to be furnished in exchange for a controlled substance, or represents proceeds traceable to such an exchange, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

This the 15th day of April, 2015.

Phillip W. Lowdermilk
Special Agent
Drug Enforcement Administration